**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **MARK FOGAL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  **No. 4:18-CV-1949 RLW** |
| | ) |
| **ANDREW SAUL,**[1] | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

Plaintiff Mark Fogal seeks review of the decision of Defendant Social Security Commissioner Andrew Saul denying his application for Disability Insurance Benefits (DIB) under the Social Security Act. For the reasons set forth below, the Court affirms the Commissioner's decision.

### I.    Background

In October 2015, Plaintiff, who was born November 1966, filed an application for DIB, alleging that he was disabled as of March 15, 2013 as a result of depression and anxiety. (Tr. 80, 157-58) The Social Security Administration (SSA) denied Plaintiff's claim, and he filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 80-86, 96-97) The SSA granted Plaintiff's request for review and conducted a hearing on October 12, 2017. (Tr. 41-79)

In a decision dated February 13, 2018, the ALJ applied the five-step evaluation set forth in 20 C.F.R. § 404.1520 and concluded that Plaintiff "has not been under a disability, as defined

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted pursuant to Fed. R. Civ. P. 25(d).

in the Social Security Act, from March 15, 2013 through the date of this decision." (Tr. 24-33) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review.  (Tr. 1-5)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision.  Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.      Evidence Before the ALJ

Plaintiff's work history included positions as policy director, executive director, and research director for nonprofit organizations.  (Tr. 209)  Plaintiff testified that he most recently worked as policy director, but his employer fired him after an outburst aimed at his colleagues at a partner organization. (Tr. 48)  Plaintiff explained that he was involved in a three-year project with another organization, whose accountant had requested from him a report "explaining where we were in terms of our budget...."  (Id.)  Plaintiff had submitted "two or three different iterations of what we though[t] was an answer," but the accountant continued to request additional information or different formatting.  (Id.)  Plaintiff explained that, one morning, the accountant left Plaintiff a voicemail asking him to redo the report by the end of the day,

> and I blew up I guess.  I called her supervisor, the project manager over at [the partner organization] and I left a long and obscene message on his voicemail, and then I called her up directly, and she certainly felt threatened by it.  I didn't intend that, but the long and the short of it is that the folks over at [the partner organization] complained to my boss, who then overheard actually the message that I left the supervisor, ... and so this happened on a Wednesday, and on Friday afternoon, I was let go.

(Id.)  After his termination, Plaintiff continued to search for jobs because "I thought that's what I needed to do .... I was nervous.  I was worried [that] ... I'm going to get another job, and I'm going to blow up again, and I'm going to get fired again ....but ... I sort of felt backed into a corner in that sense...."  (Tr. 54)

Plaintiff testified that he was also fired from a different policy director position because he "had been pretty vocal about criticizing the firm's owner….yelling and whatever in the bull pen and, you know, complaining to other people within the office what an idiot he was…." (Tr. 49) In addition to losing jobs, Plaintiff had lost friends "for similar types of outbursts[.]" (Tr. 50)

Plaintiff testified that he generally experienced one or two "really bad" days per month where "I don't want to move. I don't want to do anything." (Tr. 52) Plaintiff explained that there had been periods when he experienced these depressive episodes "kind of on a daily basis for a while … and there have been periods where … I'd go a couple of months without really hav[ing] a bad day." (Tr. 53) Plaintiff stated that the longer episodes were associated with "external event[s]," such as an election and his termination. (Id.) Plaintiff affirmed that he had experienced thoughts of suicide, and two or three years ago he "had plans about suicide." (Tr. 61) During that period, he also experienced frequent crying spells. (Id.)

Plaintiff stated that he experienced panic attacks one to three times per month "depend[ing] upon what's going on." (Tr. 59) On the advice of his doctor, Plaintiff took Xanax for panic attacks, and the panic attacks usually resolved in thirty to sixty minutes. (Tr. 59) However, Plaintiff tried to avoid taking Xanax because it made him "really sleepy[.]" (Id.)

In regard to his concentration, Plaintiff stated that "[s]ome days it's good, and some days it isn't." (Tr. 52) Plaintiff sometimes had difficulty completing tasks at home, such as following through on a refrigerator repair, and he needed reminders from his wife. (Tr. 62-63) When his attorney asked if he had difficulty focusing on and retaining reading material, Plaintiff described a recent correspondence with a charter school coordinator, which he "set [] aside" because "I can't pay attention to this right now …. I hope in the next day or two [to] get back to

3

her."[2]  (Tr. 64-65)  Plaintiff testified that his concentration problems sometimes lasted for three or four days.  (Tr. 67)  However, when his attorney asked what symptoms would prevent him from maintaining an unskilled job, he stated "I don't think concentration would be the thing that would concern me…. What would concern me would [be] my dealing … with stresses." (Tr. 68-69)

Plaintiff had "tried a lot of different medications" for his depression and anxiety.  (Tr. 55) He explained that the medications were generally effective "for two, three whatever years, and then … their effectiveness goes down."  (Tr. 55)  Plaintiff experienced "sporadic" side effects from his medications, such as dizziness during physical activity, but denied that they made him sleepy during the day.  (Tr. 56)

Plaintiff testified that, on a typical day, he awoke around 6:30 a.m. to drive his wife to work and usually took one or two one-hour naps during the day.  (Tr. 56)  Although he no longer socialized with friends, he went to restaurants two or three times a week with his wife, stating "I tend to be pretty well-behaved in restaurants."  (Tr. 50)  Plaintiff did not have problems grocery shopping, but stated that he experienced "road rage."  (Tr. 50, 67)  Plaintiff explained that he avoided outbursts by avoiding "the situation where they might occur."  (Tr. 67)  For example, Plaintiff went to the grocery store on weekday mornings when the store was quiet and "the checkout line isn't going to drive me nuts…." (Id.)

A vocational expert also testified at the hearing.  (Tr. 72-79)  The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work experience with:

---

[2] Plaintiff explained that this correspondence was not work-related.  He stated:  "I enjoy being involved in public affairs.  It's just I can't do it … on a regular basis, so this is a nice way of kind of … being in conversation with people who matter and doing it on my terms." (Tr. 65)

> [n]o exertional limitations and is able to perform at least moderately complex tasks but can have only minimal changes in job setting and duties, can have no contact with the general public, only occasional contact with coworkers and supervisors, but can handle no customer complaints or perform no fast-paced production work.

(Tr. 74)  The vocational expert stated that such an individual could not perform Plaintiff's past work, but could perform other jobs such as cleaner or marker.  (Id.)  However, the additional limitation of either unscheduled, weekly thirty- to sixty-minute breaks "due to panic attacks or other symptoms" or two extra ten- to fifteen-minute breaks per day would preclude employment. (Tr. 75-76)  Additionally, if the hypothetical individual displayed "extreme behavior ... such as a spoken refusal to follow directions, cursing or name-calling ... on average once a month," the person would not be able to maintain employment.  (Tr. 77)  Finally, the vocational expert testified that there are jobs that "involved no contact with coworkers and still occasional contact with supervisors," such as night cleaners.  (Tr. 78)

In regard to Plaintiff's medical records, the Court adopts the facts that Plaintiff set forth in his statement of material facts to the extent they were admitted by the Commissioner.  [ECF Nos.  19, 24-1]  The Court also adopts the facts contained in the Commissioner's statement of additional facts because Plaintiff did not dispute them.  [ECF No. 24-2]

## III.    Standards for Determining Disability Under the Social Security Act

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R.  § 404.1505(a).  The impairment must be "of such severity that [the claimant] is not

only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520(a). Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity. Id. Second, the claimant must establish that she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. at § 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotation omitted). At step three, the ALJ considers whether the Plaintiff's impairment meets or equals an impairment listed in 20 C.F.R., Subpart P, Appendix 1. Id. at 404.1520(d).

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). RFC is defined as "the most a claimant can do despite her limitations." Id. (citing 20 C.F.R. § 404.1545(a)(1)).

At step four, the ALJ determines whether the claimant can return to her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. § 404.1520(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. McCoy, 648 F.3d at 611.

Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. 20 C.F.R § 404.1520(g); Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012). If the claimant cannot make an adjustment to other work, then she will be found to be disabled. Id. at § 404.1520(g).

**IV.    ALJ's Decision**

Applying the five-step evaluation, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity after March 15, 2013, the alleged onset date; and (2) had the severe impairment of major depressive disorder. (Tr. 26) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Id)

The ALJ reviewed Plaintiff's medical records and found they were largely illegible. Nevertheless, the ALJ concluded that "although the evidence suggests that the claimant's mental impairment was severe, the evidence does not suggest that it resulted in greater limitations than those included in the ... residual functional capacity finding." (Id.) The ALJ reasoned that Plaintiff's mental impairments were not disabling because he was responsive to psychiatric and therapeutic treatment, such that he was able to meet with his psychologist on a monthly basis and psychiatrist on a quarterly basis, and Plaintiff did not require electroconvulsive shock therapy (ECT) or inpatient psychiatric treatment. (Tr. 29) The ALJ also noted that the mental status examinations (MSE) regularly completed by Plaintiff's psychiatrist were generally normal and Plaintiff reported improvement to his psychiatrist. (Id.)

7

The ALJ determined that Plaintiff had the RFC to:

> perform a full range of work at all exertional levels but with the following nonexertional limitation: he is able to perform at least moderately complex tasks, but can have only minimal changes in job setting and duties. He can have no contact with the general public. He can have only occasional contact with coworkers and supervisors. He cannot handle customer complaints or perform fast[-]paced production work.

(Tr. 28)  Based on the vocational expert's testimony, the ALJ found that Plaintiff was unable to perform any past relevant work, but was able to perform other jobs that existed in significant numbers in the national economy, such as cleaner and marker.  (Tr. 31-32)  The ALJ therefore concluded that Plaintiff was not disabled.  (Tr. 33)

## V.    Discussion

Plaintiff claims that substantial evidence did not support the ALJ's determination that Plaintiff was not disabled because the ALJ:   (1) failed to properly evaluate his subjective complaints; (2) had a duty to seek clarification or supplementation because she was unable to read his mental health providers' treatment notes; (3) failed to include in the RFC greater limitations on Plaintiff's interaction with coworkers and supervisors; and (4) formulated an RFC that was not supported by substantial evidence.[3]  [ECF No. 18]  The Commissioner counters that the ALJ properly evaluated the record, including Plaintiff's subjective symptoms and the medical opinion evidence, and determined Plaintiff's RFC.  [ECF No. 24]  In regard to the handwritten treatment notes, the Commissioner asserts that the ALJ was not required to obtain additional medical evidence because the record contained sufficient evidence to support the ALJ's decision. [Id.]

### A.  Standard of Judicial Review

---

[3] For ease of analysis, the Court considers the Plaintiff's arguments out of order.

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B. Subjective Complaints

The Court first considers the ALJ's evaluation of Plaintiff's subjective complaints, because the ALJ's evaluation of Plaintiff's symptoms was essential to her determination of other issues, including Plaintiff's RFC.[4] See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010)

---

[4] The SSA issued a new ruling, effective March 28, 2016, that eliminates the use of the term "credibility" when evaluating a claimant's subjective statement of symptoms, clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304, at *2 (SSA Oct. 2017). The factors to be considered in evaluating a claimant's statements, however, remain the same. See id.; Schmidt v. Berryhill, No. 4:17-CV02375 CDP, 2019 WL 339634, at *3 n.4 (E.D. Mo. Jan. 28, 2019). Because the ALJ's decision in this case was issued after March 28, 2016, SSR 16-3p applies to this matter.

("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible."). In determining the credibility of a plaintiff's subjective complaints, a court considers the following factors: 1) the claimant's daily activities; 2) the duration, intensity, and frequency of the symptoms; 3) precipitating and aggravating factors; 4) the dosage, effectiveness, and side effects of medication; 5) any functional restrictions; 6) the claimant's work history; and 7) the absence of objective medical evidence to support the claimant's complaints. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013).

Here, the ALJ found that, while "the evidence suggests that the claimant's mental impairment was severe, the evidence does not suggest that it resulted in greater limitations than those included in the above residual functional capacity finding." (Tr. 29) First, the ALJ noted that "although [Plaintiff] was involved in regular psychiatric and therapy appointments, he was responsive to treatment such that he only met with his therapist on a monthly basis and his psychiatrist on a quarterly basis." (Tr. 29) While the ALJ appeared to undercount Plaintiff's therapy appointments, which were not monthly but rather every three weeks, the ALJ properly considered that Plaintiff was seen "relatively infrequently for his impairments despite his allegations of disabling symptoms." Kamann v. Colvin, 721 F.3d 945, 950-51 (8th Cir. 2012); see also Casey v. Astrue, 503 F.3d 687, 693 (8th Cir. 2007) (noting that the claimant sought treatment "far less frequently than one would expect based on the [symptoms] that [he] alleges.").

Additionally, the ALJ found that Plaintiff's conservative treatment history undermined his claims regarding the limiting effects of his impairment. (Tr. 29) The ALJ noted that Plaintiff's providers managed his symptoms with therapy and medications. Plaintiff did not require ECT or inpatient treatment. A record of conservative treatment is a proper consideration when assessing a claimant's subjective complaints. See Milam v. Colvin, 794 F.3d 978, 985 (8th Cir. 2015) (ALJ properly considered claimant's relatively conservative treatment history when evaluating credibility); Hoskin v. Saul, No. 4:19-CV-433 SPM, 2020 WL 870985, at * 7 (E.D. Mo. Feb. 21, 2020) (same).

Next, the ALJ observed that Plaintiff's medications effectively controlled his symptoms. (Tr. 29) More specifically, the ALJ noted that Plaintiff "repeatedly reported that his medications were effective" and he required few medication changes. (Tr. 29) In fact, between March 2015 and August 2018, Plaintiff's psychiatrist adjusted Plaintiff's medications only once, which suggests that Plaintiff's symptoms were adequately controlled. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Hensley v. Colvin, 829 F.3d 926, 933-34 (8th Cir. 2016) (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)). See also Hoskin, 2020 WL 870985, at *7 ("The ALJ ... properly considered that Plaintiff reported some symptom improvement from her prescribed medication.").

Finally, in completing the psychiatric review technique prescribed by the regulations,[5] the ALJ considered Plaintiff's testimony and self-reported activities of daily living, which

---

[5] When mental impairments are present, the Commissioner is required to evaluate the severity of those impairments using a special technique called the psychiatric review technique. Cuthrell v. Astrue, 702 F.3d 1114, 1117 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520a(a), 416.902a(a)). The psychiatric review technique requires the Commissioner to "first evaluate [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." Id. at 1118 (citing 20 C.F.R. § 404.1520a(b)(1)). The Commissioner then rates "the degree of functional limitation" in the following four broad

undermined the alleged severity of his mental impairment.  For example, the ALJ noted that

Plaintiff tended to his personal care, read the newspaper, drove his wife to work, used computers

and Facebook, took care of his dogs, and went to restaurants and the grocery store.  Plaintiff also

spent time with his wife, mother, and stepfather.  When assessing the credibility of a claimant's

subjective complaints, an ALJ may consider inconsistencies between the claimant's activities of

daily living and allegations of disabling symptoms.  See McDade, 720 F.3d at 998.  See also

Halverson v. Astrue, 600 F.3d 922, 932-33 (8th Cir. 2010) (the ALJ properly considered daily

activities in conjunction with other inconsistencies in the record in assessing the credibility of

Plaintiff's complaints).

     The Court finds the ALJ considered Plaintiff's subjective complaints on the basis of the

entire record and set out a number of inconsistencies that detracted from the credibility of his

allegations of disabling symptoms.  Because the ALJ's determination not to credit Plaintiff's

subjective complaints was supported by "good reasons and substantial evidence," the Court

defers to her determination.  See Gonzales, 465 F.3d at 894.

     C.  Duty to develop the record

     Plaintiff argues that the ALJ had a duty to seek clarification or supplementation of the

record because she was unable to read (1) the treatment notes of Plaintiff's psychologist in their

entirety and (2) the handwritten, non-checklist portions of Plaintiff's psychiatrists' treatment

notes.  In response, the Commissioner asserts that the ALJ did not require clarification from

Plaintiff's mental healthcare providers because the ALJ "was able to rely on the providers' *own*

---

functional areas:  (1) understand, remember, or apply information; (2) interact with others; (3)
concentrate, persist, or maintain pace; and (4) adapt or manage oneself.   20 C.F.R. §§
404.1520a(c), 416.902a(c).

interpretations of their notes – as reflected in their medical opinion statements[.]"  [ECF No. 24 at 13 (emphasis in original)]

In this case, the only records of Plaintiff's mental health treatment between January 2013 and August 2018 are the handwritten notes of his psychiatrists, Drs. Montani and Rauban, and psychologist Dr. Mozenter.  Dr. Montani treated Plaintiff from December 2013 to December 2014, during which time he frequently changed Plaintiff's medications and/or adjusted dosages. (Tr. 317-18, 320-25)  In January and April 2014, Dr. Montani's checklist mental status examinations (MSE) noted that Plaintiff's mood was dysthymic. (Tr. 321, 324)  In April 2014 Dr. Montani observed that Plaintiff was experiencing suicidal thoughts with "no intent," continued Plaintiff's Wellbutrin and Xanax, and prescribed Zoloft. (Tr. 321, 324)  The MSEs completed by Dr. Montani after May 2014 were normal. (Tr. 316-18)

Plaintiff established care with psychiatrist Dr. Rauban in March 2015. (Tr. 355-56)  At that time, Plaintiff was taking Wellbutrin, Zoloft, and Xanax. (Tr. 355)  Dr. Rauban performed an MSE, which reflected that Plaintiff's speech and thought processes were normal and he denied suicidal, homicidal, and violent ideation. (Tr. 356)  At their next appointment in June 2015, Dr. Rauban completed a checklist MSE, stating that Plaintiff was:  well-dressed and groomed; spoke with a regular rate and rhythm; demonstrated logical and sequential flow and content of thought; exhibited intact association and attention/concentration; denied suicidal and homicidal ideation; and had a euthymic affect/mood. (Tr. 313)  Plaintiff's checklist MSEs were unchanged in September and December 2015 (Tr. 311, 312).

When Dr. Rauban treated Plaintiff in March 2016, the MSE was normal except Dr. Rauban noted that Plaintiff's speech was "soft" and his affect/mood was dysthymic. (Tr. 351) Dr. Rauban increased Plaintiff's Zoloft. (Id.)  At Plaintiff's subsequent appointments with Dr.

Rauban in June 2016, October 2016, January 2017, May 2017, August 2017, February 2018, and May 2018, his MSEs were normal. (Tr. 8, 20, 347-50)

Dr. Rauban completed a medical source statement (MSS) for Plaintiff in August 2017, diagnosing him with major depressive disorder. (Tr. 326-29) Dr. Rauban wrote that Plaintiff was "on medication and receives psychotherapy from a psychologist and is fairly treatment responsive to the point he is now able to go 3-4 months between appointments." (Tr. 326) Dr. Rauban described Plaintiff as "negative and dysthymic most days, cynical and sarcastic [illegible] his depression." (Id.) Dr. Rauban assessed Plaintiff's prognosis as "fair," and checked the following signs and symptoms: anhedonia or pervasive loss of interest in almost all activities; decreased energy; blunt, flat or inappropriate affect; and mood disturbance. (Tr. 326-27)

On the checklist form of "mental abilities and aptitudes needed to do unskilled work," Dr. Rauban stated that Plaintiff's ability to work in coordination with or proximity to others without being unduly distracted was "seriously limited but not precluded," and the following abilities were "limited but satisfactory": remember work-like procedures; maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; complete a normal work day and work week; perform at a consistent pace; accept instruction and respond appropriately to criticism from supervisors; deal with normal work stress; interact appropriately with the general public, coworkers, supervisors; and maintain socially appropriate behavior. (Tr. 328) Finally, Dr. Rauban estimated that Plaintiff's impairments or treatment would cause him to be absent from work two to three days per month. (Tr. 329)

The record also included the treatment notes of psychologist Dr. Mozenter who treated Plaintiff from January 2014 through August 2018.[6]  In August 2018, Dr. Mozenter completed an MSS for Plaintiff, diagnosing him with major depressive disorder.  (Tr. 385-88)  Dr. Mozenter stated that she provided Plaintiff "anger management, cognitive behavioral therapies, behavioral anxiety and stress management along side pharmacotherapy per MD," and she assessed his prognosis as "poor regarding consistency needed to work."  (Tr. 385)  She described the following clinical findings:  "Pervasive mood + anxiety instability with anger at times, suicidality, inadequate energy, concentration + ability to perform tasks in a reliable, consistent manner."  (Id.)  On a list of signs and symptoms, Dr. Mozenter placed checkmarks next to the following:  anhedonia; decreased energy; thoughts of suicide; blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; impairment in impulse control; mood disturbance; difficulty thinking or concentration; pathological dependence, passivity, or aggressivity; change in personality; seclusiveness; emotional withdrawal or isolation; intense and unstable interpersonal relationships and impulsive and damaging behavior; emotional instability; deeply ingrained, maladaptive patterns of behavior; inflated self-esteem; and pathologically inappropriate suspiciousness or hostility.  (Tr. 386)

Dr. Mozenter assessed Plaintiff's "abilities and aptitudes needed to do unskilled work" and opined that Plaintiff was:  "unable to meet competitive standards" in his ability to accept and respond appropriately to criticism from supervisors and interact appropriately with the general public, coworkers, and supervisors; "seriously limited but not precluded" in his ability to work in

---

[6] Dr. Mozenter's notes are handwritten and largely illegible.  The Court notes, however, that Plaintiff's appointments with Dr. Mozenter became less frequent over time.  Plaintiff saw Dr. Mozenter nineteen times in 2013, nineteen times in 2014, sixteen times in 2015, fifteen times in 2016, thirteen times in 2017, and twelve times in 2018.

coordination or proximity to others, get along with co-workers or peers, and deal with normal work stress; and "limited but satisfactory" in his ability to maintain regular attendance, complete a normal work day and work week, respond appropriately to changes in work setting, and maintain socially appropriate behavior. (Tr. 387) Dr. Mozenter explained these limitations as follows: "Impulsivity, judgment, interpersonal relationships and team cooperation are unpredictable and often inappropriate as evidenced by outbursts, all or none thinking and emotional reactivity and hostility at times. I have witnessed this behavior and been subjected to it." (Tr. 387) Dr. Mozenter estimated that Plaintiff would miss zero to one day of work per month, and she explained that Plaintiff would have difficulty maintaining full-time employment due to: "issues with anger, interpersonal relationships, anxiety + difficulty sustaining stable, predictable, appropriate interpersonal/peer/supervisor behavior and relationships." (Tr. 388)

The ALJ reviewed Plaintiff's medical records and observed that Plaintiff met with Dr. Mozenter "on an approximately monthly basis" between April 2013 and October 2017, but stated that "because Dr. Mozenter's treatment notes are handwritten and illegible, the content of the appointments is indiscernible." (Tr. 28) As to Dr. Rauban's treatment notes, the ALJ stated that his notes were also "largely handwritten and illegible" but, "because they are handwritten into a typed template, it is possible to discern that they consistently document normal mental status examinations." (Id.)

Plaintiff argues that, because the ALJ was unable to read Dr. Mozenter's records and only the MSE portions of Dr. Rauban's records, she had a duty to seek clarification or supplementation. Plaintiff correctly asserts that an ALJ "has a duty to fully and fairly develop the evidentiary record." Byes v. Astrue, 687 F.3d 913, 915-16 (8th Cir. 2012). Additionally, "illegibility of important evidentiary material can warrant a remand for clarification and

16

supplementation." Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990).  However, an ALJ is not required "to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped."[7]   Jones v. Astrue, 619 F.3d 963, 969 (8th Cir. 2010) (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)).  "[T]he claimant's failure to provide [legible] medical evidence … should not be held against the ALJ when there is medical evidence that supports the ALJ's decision."   Shackleford v. Astrue, No. 4:10-CV-2175 AGF, 2012 WL 918864, at *11 (E.D. Mo. Mar. 19, 2012) (quoting Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008)).

Here, despite the ALJ's inability to read Dr. Mozenter's and Dr. Rauban's treatment notes, the record contained substantial evidence of Plaintiff's mental condition such that the record did not require further development.  Importantly, the record included Dr. Mozenter's MSS, which she completed based upon her long-term treatment of Plaintiff's mental impairment. In the MSS, Dr. Mozenter did not simply check boxes on the form, but she set forth her observations, her clinical findings, and the bases for her opinion.  The record also contained the MSEs regularly completed by Plaintiff's psychiatrists between December 2013 and May 2018, and the MSS of Plaintiff's long-time treating psychiatrist.  Given the substantial evidence of Plaintiff's mental impairment, this is not a case in which a crucial issue was undeveloped.  The Court therefore finds that there was no need for the ALJ to further develop the record.[8]  See, e.g.,

---

[7] The regulations explain that "contacting a treating physician is necessary only if the doctor's records are 'inadequate for us to determine whether [the claimant is] disabled' such as 'when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.' 20 C.F.R. §§ 404.1512(e), 416.912(e)." Jones, 619 F.3d at 969 (quoting Goff, 421 F.3d at 791);

[8] Plaintiff briefly argues that, because the ALJ was unable to read Dr. Mozenter's treatment notes, substantial evidence did not support the ALJ's decision to assign Dr. Mozenter's opinion partial weight.  A treating physician's opinion regarding a claimant's impairments is entitled

Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011); Hovis v. Colvin, No. 1:15-CV-73 JMB, 2016 WL 4158867, at *13 (E.D. Mo. Aug. 5, 2016).

     D. RFC

     Plaintiff argues that the ALJ erred in formulating his RFC because the RFC allowed Plaintiff occasional interaction with coworkers and supervisors. More specifically, Plaintiff argues that, because both Dr. Mozenter and Dr. Rauban opined that Plaintiff's ability to work in coordination with or proximity to others was seriously limited, and the ALJ assigned Dr. Rauban's opinion "great weight," the RFC was not sufficiently limiting. Plaintiff also contends that the RFC was not supported by substantial evidence. The Commissioner counters that the RFC assessment in this case reflects the ALJ's careful consideration of Plaintiff's credible work-related limitations.

     RFC is the most a claimant can still do in a work setting despite that claimant's physical or mental limitations. Martise, 641 F.3d at 923; 20 C.F.R. § 416.945(a)(1). An ALJ determines a claimant's RFC "based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of [his] limitations." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

---

to controlling weight where "the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Where an ALJ gives a treating physician's opinion less than controlling weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)). Here, the ALJ found that "the record does not indicate that the claimant's mental abilities are as limited as Dr. Mozenter suggested" and assigned Dr. Mozenter's opinion "some weight." (Tr. 30) The ALJ explained that the evidence "show[ed] few medication changes and consistently normal mental status examinations, including a logical and sequential flow of thought and intact attention/concentration." (Tr. 30) The Court finds that substantial evidence supported the ALJ's decision to assign Dr. Mozenter's opinion partial weight.

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Hensley, 829 F.3d at 932 (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)). "However, there is no requirement that an RFC determination be supported by a specific medical opinion or that an RFC must be linked in each of its components to a specific medical opinion." Hull v. Berryhill, No. 2:17-CV-15 NCC, 2018 WL 4538996, at *7 (E.D. Mo. Sept. 20, 2018) (citing Hensley, 829 F.3d at 931-32, Martise, 641 F.3d at 927).

Drs. Mozenter and Rauban opined in their MSS's that Plaintiff's ability to work in coordination with or proximity to others without becoming unduly distracted was "seriously limited but not precluded." (Tr. 328, 387)  While the ALJ assigned only "some weight" to Dr. Mozenter's opinion, she found that "the medical evidence of record supports the vast majority of Dr. Ra[u]ban's opinion."[9]  (Tr. 30)  The ALJ explained Plaintiff's consistently normal MSEs, infrequent medication changes, and need for only quarterly appointments since July 2014 supported Dr. Rauban's assessment of Plaintiff's functional limitations.  Based on the ALJ's review of the record as a whole, the ALJ determined that Plaintiff was able to perform "moderately complex tasks" with "minimal changes in job setting and duties," "only occasional contact with coworkers and supervisors," and no "contact with the general public," "fast paced production work," or "hand[ling] customer complaints." (Tr. 28)

As an initial matter, the Court finds no inconsistency between Dr. Rauban's opinion that Plaintiff's ability to work with or in proximity to others was "seriously limited *but not precluded*" and the ALJ's finding that Plaintiff could sustain occasional contact with coworkers and supervisors.  Furthermore, evidence in the record supported that limitation.  For example,

---

[9] The ALJ assigned "great weight" to Dr. Rauban's opinion "apart from the statement regarding a speculative prediction of the claimant's absences." (Tr. 30)

Plaintiff testified that he was able to frequent restaurants, grocery shop, and spend time with his wife. Plaintiff also searched for a job, communicated with others on Facebook, and maintained correspondences about public affairs. These activities suggested that Plaintiff had at least a limited ability to interact with others. Additionally, the MSEs completed by Dr. Rauban consistently stated that Plaintiff was well-groomed, his thought process was logical and sequential, his affect/mood was euthymic, and his speech and attention/concentration were normal. Upon review of the record as a whole, the Court finds substantial evidence supported the ALJ's limitations on Plaintiff's contact with coworkers and supervisors. See, e.g., Brown v. Saul, 2:19-CV-42 ACL, 2020 WL 5632442, at *9 (E.D. Mo. Sept. 21, 2020).

Finally, Plaintiff argues that the RFC is not supported by substantial evidence because Dr. Mozenter's treatment notes contained evidence of Plaintiff's mental impairment that the ALJ neither considered nor discussed. For example, Plaintiff points out that, according to Dr. Mozenter's treatment notes of March 2014, Plaintiff reported crying episodes, anger outbursts, and an argument with his father, after which he threw a glass at the wall and asked his father to leave. (Tr. 404) In April 2014, Plaintiff called Dr. Mozenter "screaming" in response to a text message she sent him and, later that month, Dr. Rauban suggested ECT, Lithium and/or clonazepam to treat Plaintiff's ongoing suicidality. (Tr. 320, 405)

Notably, the episodes Plaintiff cites occurred in early-2014, more than three years before the ALJ's hearing in October 2017. Plaintiff's medical records reflect that his condition improved and stabilized over time. Plaintiff's MSEs were consistently normal after May 2014 and Dr. Rauban adjusted Plaintiff's medications only once between March 2015 and May 2018. As previously stated, a condition that is "controllable and amenable to treatment [ ] 'do[es] not

support a finding of disability.'" Martise, 641 F.3d at 924 (quoting Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009)).

In determining Plaintiff's RFC, the ALJ properly considered Plaintiff's medical records (to the extent they were legible), medical opinion evidence, and testimony, as well as the third-party function report completed by Plaintiff's wife. The ALJ noted that Plaintiff regularly treated with a psychiatrist and psychologist, was responsive to treatment, and improved with medication. The ALJ also noted the conservative nature of Plaintiff's mental health treatment, which consisted of medication and therapy, and the fact that Plaintiff did not require ECT or inpatient psychiatric treatment. The ALJ nonetheless credited Plaintiff's claims of severe depression and emotional volatility and limited him to no contact with the public and occasional contact with coworkers and supervisors. The Court therefore finds that substantial evidence on the record supported the ALJ's RFC determination.

## VI.   Conclusion

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports Defendant's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of Defendant denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

Dated this 17th day of November, 2020.

_Ronnie L. White_
RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE

21